WINDOM, Presiding Judge.
Roy Edward Perkins, a death-row inmate at Holman Penitentiary, appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P., in which he attacked his capital-murder conviction and sentence of death.
In 1994, Perkins was convicted of murdering Cathy Gilliam during the course of a kidnapping in the first degree, see § 13A-5-40(a)(l), Ala.Code 1975. The jury recommended, by a vote of 10-2, that Perkins be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Perkins to death. On direct appeal, both this Court and the Alabama Supreme Court affirmed Perkins’s conviction and sentence of death. See Perkins v. State, 808 So.2d 1041 (Ala.Crim. App.1999), affd, 808 So.2d 1143 (Ala.2001). The Supreme Court of the United States, however, remanded the cause to the Alabama Supreme Court in light of its holding in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that it is unconstitutional to sentence a mentally retarded individual to death. See Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). On remand from the Supreme Court of the United States, the Alabama Supreme Court found that the record did not show that Perkins met the most liberal definition of mental retardation and affirmed Perkins’s death sentence. See Ex parte Perkins, 851 So.2d 453 (Ala.2002). Thereafter, the Supreme Court of the United States denied certiorari review. See Perkins v. Alabama, 540 U.S. 830, 124 S.Ct. 69, 157 L.Ed.2d 55 (2003). This Court issued the certificate of judgment on February 20, 2003.
In 2004, Perkins filed a 372-page Rule 32, Ala. R.Crim. P., petition in the Tuscaloosa Circuit Court attacking his conviction and sentence of death. Perkins filed amendments to specific issues in September 2004, May 2005, August 2007, and May 2009.
The reason for the delay in this case is that Perkins filed several extraordinary petitions while his postconviction petition was pending in the Tuscaloosa Circuit Court. In May 2005, Perkins moved for discovery, seeking access to his Department of Youth Services (“DYS”) and Department of Human Resources (“DHR”) records and to DHR records related to his mother, stepfather, and sister. The circuit court denied that motion. In Ex parte Perkins, 920 So.2d 599 (Ala.Crim.App. 2005), this Court granted Perkins’s peti *464 tion for a writ of mandamus and directed the circuit court to grant him discovery of his own DYS and DHR records. In May 2006, this Court denied Perkins’s second extraordinary petition requesting that this Court set aside the circuit court’s order granting the State reciprocal discovery. See Ex parte Perkins, (CR-05-0148, May 31, 2006). In April 2008, the circuit court held an evidentiary hearing on Perkins’s postconviction petition and on July 30, 2009, issued an order denying relief.[1] On August 17, 2009, Perkins moved the circuit court to rule on those claims not specifically addressed in its July 30 order. On September 3, 2009, the circuit court amended its original order denying Perkins’s petition. Perkins appealed to this Court.
The circuit court set out the following facts in its order sentencing Perkins to death:
“On August 9,1990, in north Tuscaloosa County, [Perkins] came to the residence of Cathy Gilliam, who was there alone except for her daughter. [Perkins], who was identified at trial, kidnapped the victim, Cathy Gilliam, with a handgun while victim’s daughter watched. [Perkins] then drove away with the victim, and the daughter called for help.
“About an hour later, [Gilliam] showed up at Maudeen Hoods’ residence, stating she’d been shot, was dying and needed help. Ms. Hood called the authorities. [State Trooper Eldon] Willingham got information on the suspect, his vehicle and direction of travel from [Gilliam], He noted that [Gilliam] had been shot in the chest but not through the front of her shirt. The evidence was that [Gilliam] also did not have gunpowder stippling on her shirt. [Gilliam] was taken to a hospital but died before getting there. The bullet wound had an exit point just to the right of center on her back. [Gilliam] also had a stab wound near her clavicle and a broken bone in her neck.
“Chief Deputy Butch Hopson of Fay-ette, Alabama, on August 8, 1990, heard about a shooting or kidnapping by [Perkins] or someone fitting his description, over his radio. He was driving toward Tuscaloosa County and saw [Perkins], whom he recognized, coming toward him in a truck. He turned around and went after [Perkins], who drove to a road and abandoned the truck. The truck had been missing from its owner along with a long rifle and a .357 Magnum caliber handgun. The truck was abandoned less than a mile from [Perkins’s] mother’s house.
“[Perkins] was captured a few days later in the woods after a big manhunt. It was later learned that [Perkins] had gone to Darlene Hall’s house, which was near [Gilliam’s] house, just before going to [Gilliam’s] house. Ms. Hall got suspicious of [Perkins], who asked to use her phone, and had seen his picture in the newspaper as a suspected rapist. She ran him off with an unloaded rifle. [Perkins] left in a truck.
“[Perkins] had been in prison for rape, second degree, and was out on parole. About August 1, 1990, he had asked his cousin, [B.P.], to help him. [Perkins] drove her to a block building near his mother’s house. [Perkins] pulled a knife on her and forced her to have sexual intercourse with him. She was able to escape eventually. About August 6, 1990, [D.W.] was grabbed by [Perkins] and taken to the same block building at knifepoint and forced to have repetitive ' sexual intercourse and sodomy with *465 [Perkins]. Her hands were tied during the sexual attacks.
“At trial, evidence proved beyond a reasonable doubt that [Perkins] kidnapped [Gilliam] with intent to violate her sexually or to inflict physical injury on her and that, during this kidnapping, [Perkins] intentionally caused [Gilliam’s] death by shooting her with a gun, specifically a .357 magnum caliber handgun.”
(Trial record, p. 345-47.)[2]
At trial, Perkins’s counsel stipulated to the following:
“[Perkins] caused the death of Cathy Gilliam with a .357 Magnum pistol.... [Perkins] was in the 1979 Chevrolet gray pickup truck shown in State’s exhibit number 23.... Cathy Gilliam’s blood was found in the 1979 gray Chevrolet pickup truck shown in State’s Exhibit number 23.”
(Trial record, p. 2087.)

Standard of Review

Perkins appeals the circuit court’s denial of a postconviction petition he filed in the Tuscaloosa Circuit Court attacking his capital-murder conviction and sentence of death. According to Rule 32.3, Ala. R.Crim. P., “The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
“Though we reviewed the claims on [Perkins’s] direct appeal for plain error, the plain-error standard of review does not apply to a postconviction petition attacking a capital-murder conviction and death sentence. See Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App. 2008); Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007); Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007); Gaddy v. State, 952 So.2d 1149 (Ala.Crim.App. 2006). ‘In addition, “[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.” ’ Brownlee v. State, 666 So.2d 91, 93 (Ala. Crim.App.1995). When reviewing the circuit court’s rulings on the claims raised in [Perkins’s] postconviction petition, we apply an abuse-of-discretion standard. Gaddy, 952 So.2d at 1154.”
Ray v. State, 80 So.3d 965, 971 (Ala.Crim. App.2011).
With these principles in mind, this Court turns to the claims Perkins raises in his brief to this Court.
I.
Perkins first argues that the circuit court erred in denying his claim that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose a statement the victim’s daughter made to a victims’ services officer with the Tuscaloosa County District Attorney’s Office.
At Perkins’s trial, Candace Gilliam testified that on August 9, 1990, at around 4:00 p.m., she heard her mother scream. After this statement, Candace became very emotional and started crying. Perkins’s counsel and the State stipulated to the following in lieu of Candace’s continued testimony:
“When [Candace] heard her mother scream a second time, Candace went to the kitchen. There she saw a man holding her mother and pointing a black pistol at her mother’s head. She heard her mother yell for help and say ‘something about a rapist.’ (R. 1755.) Candace watched as the man led her mother *466 outside to a vehicle parked behind her mother’s car. She could not see the vehicle well, but did notice that it was bigger than a car and that it was gray in color. At that point, Candace telephoned her grandmother. Candace was unable to give a detailed description of the man who had abducted her mother, but she did tell police that the man had brown, straight hair and a thin beard, and that he was not much taller than her mother.”
Perkins, 808 So.2d at 1053.
When denying relief on this claim, the circuit court stated:
“The evidence presented to this court established that, at the trial stage, [the] State represented to the Defense that it was following an ‘open file’ policy of permitting defense counsel to have access to all discovery information. Based on that understanding, trial counsel agreed to. stipulate that Candace Gilliam’s testimony would be that the victim, her mother, yelled ‘something about a rapist’ as she was being abducted by [Perkins]. The evidence was undisputed that the prosecution did not produce to the defense a videotaped statement of the witness that was made shortly after the crime. The first time trial counsel heard of the existence of the tape was during the Rule 32 proceedings. In the videotaped interview, Candace Gilliam states she could not hear what her mother said when she was abducted. For example, at 4:45 of the tape, the following occurred:
“ ‘Q: Did your Mom, do you remember your Mom saying? I know you said she screamed, but ...
“ ‘A: (Inaudible) It sounded like she was saying something but (inaudible)
“ ‘Q: I’m sorry I couldn’t ...
“‘A: Sounded like she was saying something but, um, I don’t know.’
“The stipulation differs from the statements made by the witness in the recorded interview. Both of [Perkins’s] trial attorneys testified that they never would have stipulated to the testimony of Candace Gilliam regarding what she heard her mother say had they known of the tape. There was no testimony or evidence presented during the Rule 32 proceedings from the District Attorney’s office regarding any reason why the videotape was not produced by the State, i.e., no evidence was presented as to whether the failure to produce it was inadvertent or not. Therefore, this court has to accept as undisputed evidence that the State withheld the videotaped statement from the defense. Neither trial nor appellate counsel could have known of the existence of the tape, and therefore, the claim is not and could not be precluded.
“Based on the discovery order and agreement in this case, the videotape should have been produced as it was favorable impeachment evidence of the witness for the State. Furthermore, defense counsel would not have stipulated to the evidence proffered by the State if they had known of the tape. To warrant a reversal, however, the evidence must be ‘material’:
“ ‘The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A “reasonable probability” is a probability sufficient to undermine confidence in the outcome.’ United States v. Bag-ley, 473 U.S. [667,] 682 [ (1985) ]. Ex parte Belisle, [11 So.3d 323, 330-31] (Ala.2008).
“Had defense counsel known of the tape, the stipulation would not have been made and Candace Gilliam would *467 have been required to testify at length. Defense counsel could have attempted to impeach her testimony that she heard her mother say something about a ‘rapist’ by using the videotape. This would not, however, have changed the outcome of the case. After considering and reviewing the appropriate materials, it is apparent that the outcome would not have been different under those circumstances and no relief is warranted on this ground.”
(C. 4488-90) (Emphasis in original.)
At the postconviction evidentiary hearing, Perkins presented testimony that Candace had been interviewed by Pat Lyons, a victims’ services officer, on August 22, 1990, shortly after the murder. In this interview Lyons asked Candace if she had heard what her mother had yelled. Candace responded that her mother yelled something but that she “didn’t know.” Perkins asserts that Candace’s statement to Lyons was not disclosed to the defense, that the statement would have undermined Candace’s stipulated testimony, and that the statement was material to his defense.
This Court has reviewed the tape of Candace’s statement. At the time of the interview, Candace was in the sixth grade. On the tape, she is sitting on a sofa next to her father. Candace appears visibly shy, nervous, and reticent. When asked questions, she frequently looked to her father for guidance. Lyons asked if she had heard what her mother yelled, and Candace responded that it sounded like she was trying to say something but that she “didn’t know.” She said that she saw a man -with a beard and brown hair take her mother at gunpoint.
In Brady v. Maryland, the United States Supreme Court held that “[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” 373 U.S. at 87.
“A Brady [v. Maryland, 373 U.S. 83 (1963),] violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990); Delap v. Dugger, 890 F.2d 285 (11th Cir.1989); United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert, denied, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed;2d 256 (1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert, denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a Brady violation as follows: ‘The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A “reasonable probability” is a probability sufficient to undermine confidence in the outcome.’ See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Stano v. Dugger, 901 F.2d at 899; Delap v. Dugger, 890 F.2d at 299; Coral v. State, 628 So.2d 954 (Ala.Cr.App.1992); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991), cert, denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 *468 (1972); Ex parte Womack [, 435 So.2d. 766 (Ala.1983) ]. ‘When the “reliability of a given witness may well be determinative of guilt or innocence,” nondisclosure of evidence affecting credibility falls within the general rule.’ Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state’s witness.” '
Williams v. State, 710 So.2d 1276, 1296-97 (Ala.Crim.App.1996).
In this case, the Brady claim was not raised on direct appeal but instead was raised in a postconviction collateral proceeding. When addressing Brady claims in collateral proceedings, this Court has stated:
“Because this Brady [v. Maryland, 373 U.S. 83 (1963),] claim was first presented in a Rule 32 petition, [the petitioner] can obtain relief only if it involves ‘newly discovered evidence.’ Newly discovered evidence is defined under Rule 32.1, Ala. R.Crim. P., as follows:
“ ‘Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
[[Image here]]
“‘(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
“ ‘(1) The facts relied upon were not known by petitioner or petitioner’s counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
“ ‘(2) The facts are not merely cumulative to other facts that were known;
“ ‘(3) The facts do not merely amount to impeachment evidence;
“ ‘(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
“ ‘(5) The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received.’
“Rule 32.1(e), Ala. R.Crim. P. We note that because of the conjunctive ‘and’ between (4) and (5), [Perkins] must meet all five prerequisites of Rule 32.1(e), Ala. R.Crim. P., in order to prevail. Cf. Brown v. State, [807 So.2d 1 (Ala.Crim. App.1999) ].”
Payne v. State, 791 So.2d 383, 397-98 (Ala. Crim.App.1999).
Not only did Perkins fail to satisfy the requirements for establishing a Brady violation, Perkins also failed to satisfy the requirements for showing that this claim was based on newly discovered evidence. Perkins did show that the State failed to disclose Candace’s statement and that the statement would have been relevant for impeachment. However, contrary to Perkins’s assertions, the stipulated testimony was not the only evidence that tended to establish Perkins’s intent. Two witnesses testified that in the two weeks before the kidnapping and murder of Gilliam, Perkins had raped them. B.P. testified that she knew Perkins and that he had asked her to *469 go with him to return a car to a friend. She said that after they had been driving for several minutes Perkins turned down a dirt road, put a knife to her throat, and raped her. D.W. testified that, as she was getting out of her vehicle at her grandmother’s house, Perkins came up behind her and put a knife to her throat. She said that he drove her to an abandoned building and raped her. Darlene Hall also testified that minutes before Gilliam was abducted, Perkins came to her house, knocked on her door, asked if her husband was at home, and asked to use her telephone to call a tow truck because, he said, his car was stuck in a field. Hall said that she did not open the door and that Perkins left. On direct appeal, this Court held that the collateral acts were admissible to show Perkins’s intent. Perkins, 808 So.2d at 1084.
Perkins failed to establish that there is a reasonable probability that, had Candace’s pretrial statement been disclosed, the outcome of the trial would have been different. Williams, 710 So.2d at 1296-97. Therefore, this Court agrees with the circuit court that Perkins failed to meet his burden of proving a Brady violation.
II.
Perkins next argues that the State violated his constitutional right to due process by knowingly using false testimony by informing the defense that Candace would testify that her mother yelled something about a rapist as she was being forced from the house. According to Perkins, the State’s representation was false because a pretrial statement by Candace indicated that she did not know what her mother yelled.
“[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment....” Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
“[T]he knowing use of material false evidence by the state in a criminal prosecution does violate due process. Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959); Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341-42, 79 L.Ed. 791, 794 (1935); Skipper v. Wainwright, 598 F.2d 425, 427 (5th Cir.) (per curiam), cert, denied, 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). This rule applies equally when the state, although not soliciting perjured testimony, allows it to go uneorrected after learning of its falsity. Giglio, 405 U.S. at 153, 92 S.Ct. at 766, 31 L.Ed.2d at 108; Napuie ], 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. In addition, ‘[i]t is of no consequence that the falsehood [bears] upon the witness’ credibility rather than directly upon [the] defendant’s guilt.’ Napue, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221 (quoting People v. Savvides, 1 N.Y.2d 554, 557, 136 N.E.2d 853, 854, 154 N.Y.S.2d 885, 887 (1956)); see Giglio, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.”
Williams v. Griswold, 743 F.2d 1533, 1541 (11th Cir.1984). See also Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir.1996).
To prove a Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), violation, the petitioner must show that: (1) the State used the testimony; (2) the testimony was false; (3) the State knew the testimony was false; and (4) the testimony was material to the guilt or innocence of the accused. Williams v. Griswold, 743 F.2d at 1542. “[T]he defendant must show that the statement in question was ‘indisputably false,’ rather than merely misleading.” Byrd v. *470 ColUns, 209 F.3d 486, 517 (6th Cir.2000) (quoting United States v. Lochmondy, 890 F.2d 817, 828 (6th Cir.1989)). “The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.” Lochmondy, 890 F.2dmt 822. “[I]t is not enough that the testimony is challenged by another witness or is inconsistent with prior statements, and not every contradiction in fact or argument is material.” United States v. Payne, 940 F.2d 286, 291 (8th Cir.1991) (citing United States v. Bigeleisen, 625 F.2d 203, 208 (8th Cir.1980)). “[T]he fact that a witness contradicts himself or herself or changes his or her story does not establish perjury.” Malcum v. Burt, 276 F.Supp.2d 664, 684 (E.D.Mieh.2003) (citing Monroe v. Smith, 197 F.Supp.2d 753, 762 (E.D:Mich.2001)).
At the postconviction evidentiary hearing, Candace did not testify. No evidence was presented that the stipulated testimony was, in fact, false. Inconsistent statements by a witness do not, by themselves, establish that one statement is false and the other is true. See United States v. Payne, swpra. Accordingly, Perkins failed to meet his burden of proving a Giglio violation, and the circuit court correctly denied relief on this claim.
III.
Perkins next argues that the circuit court erred in denying his claim that he was denied the effective assistance of counsel during his capital-murder proceedings. He cites several grounds in support of this ai-gument.
The Supreme Court of the United States in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), held that to prevail on a claim of ineffective assistance of counsel the petitioner must establish: (1) that counsel’s performance was deficient and (2) that he was prejudiced by the deficient performance.
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting-for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining .counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf Engle v. Isaac, 456 U.S. 107, 133— 134, 102 S.Ct. 1558, 1574-1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689.
“The purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052,] 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (“We are not interested in grading lawyers’ performances; we are interested in whether the adver *471 sarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).
At trial, Perkins was represented by attorneys Dennis Steverson and James Smith. Both attorneys testified at Perkins’s postconviction evidentiary hearing.
Initially, this Court notes that the record of Perkins’s trial shows that in October 1992, Perkins’s counsel filed a motion requesting that Perkins be allowed to act as co-counsel. (Trial C. 47.) The trial court granted that motion. (Trial R. 60.) Thus, this Court must first determine what affect, if any, Perkins’s request to act as co-counsel has on his claims of ineffective assistance of counsel. When confronted with a similar fact situation, courts have held: “Whether a defendant may claim ineffective assistance from standby counsel depends on whether hybrid representation is more akin to a defendant proceeding pro se or is more akin to a defense controlled by counsel.” Warr v. State, 877 N.E.2d 817, 823 (Ind.Ct.App.2007) (citing Henson v. State, 798 N.E.2d 540, 546 (Ind.Ct.App. 2003), citing in turn Carter v. State, 512 N.E.2d 158, 164 (Ind.1987)). See Lee v. Hines, 125 Fed.App’x 215, 217 (10th Cir. 2004) (“A defendant who chooses to represent himself and has the assistance of court appointed counsel cannot succeed in establishing ineffective assistance against such counsel when it is clear that the defendant maintained control of his defense.”); People v. Kevorkian, 248 Mich. App. 373, 639 N.W.2d 291 (2001) (counsel cannot be held to the standards of effective assistance when defendant maintained control of his defense). See also Thomas M. Place, Post Conviction Developments, 79 Pa. B.A. Q. 145 (2008); Gregory G. Sarno, Modem Status of Rules and Standards in State Courts as to Adequacy of Defense Counsel’s Representation of Criminal Client, 2 A.L.R.4th 27 (1980).
In this case, nothing in the trial record suggests that Perkins intended to or did waive his right to counsel. In fact, the record shows that counsel maintained control of Perkins’s defense and that Perkins played a minor role in the proceedings. Perkins did not waive any claims of ineffective assistance of trial counsel, and those claims are properly before this Court in this postconviction proceeding.
Perkins first argues that his trial counsel was ineffective for failing to challenge for cause or for fading to use peremptory strikes to remove various jurors who he asserts were biased or impartial. .
The circuit court stated the following concerning this claim:
“This claim was raised on appeal and rejected by the appellate court(s). It cannot form the basis of an ineffective assistance of counsel claim. Even if it could be re-litigated, the claim fails as there is no proof that trial counsel were ineffective nor that any challenge to the *472 jurors in question would have been sustained by the trial judge.”
(R. 4493.)
This Court notes that the portion of the circuit court’s order holding that this claim was raised on direct appeal is erroneous. On direct appeal, this Court specifically addressed Perkins’s claim that the trial court erred in denying 14 of Perkins’s challenges for cause. This Court found no error in the court’s failure to remove those 14 jurors for cause. Perkins, 808 So.2d at 1073-75. Only one juror who is challenged in this postconviction proceeding, N.W., was also challenged on direct appeal for a different reason than the reason raised in this proceeding. Nonetheless, the circuit court gave alternative grounds for denying relief on these claims. Moreover, this Court may affirm a lower court’s ruling on a postconviction petition if it is correct for any reason. See McNabb v. State, 991 So.2d 313, 333 (Ala. Crim.App.2007).
When reviewing claims of ineffective assistance of counsel related to counsel’s performance during voir dire examination, this Court gives great deference to the counsel’s decisions.
“Counsel is ... accorded particular deference when conducting voir dire. An attorney’s actions during voir dire are considered to be matters of trial strategy. Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir.1997) (citing Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir.1995)). A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel’s decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness. Id.”
Hughes v. United States, 258 F.3d 453, 457 (6th Cir.2001).
“[Wjhere a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased.” Carra-telli v. State, 961 So.2d 312, 324 (Fla.2007). “Because [the appellant’s] claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, [the appellant] must show that the juror was actually biased against him.” Miller v. Francis, 269 F.3d 609, 616 (6th Cir.2001) (citing Hughes v. United States, 258 F.3d 453, 458 (6th Cir.2001)). “[The appellant’s] claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, [the appellant] must show that the juror was actually biased against him.” Goeders v. Hundley, 59 F.3d 73, 75 (8th Cir.1995) (citing Smith v. Phillips, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1981)). “[T]o show attorney error and prejudice in defense counsel’s failure to use peremptory strikes for [biased] veniremen, it is necessary for [the appellant] to show that the veniremen did indeed harbor actual bias against [the appellant].” Parker v. Turpin, 60 F.Supp.2d 1332, 1362 (N.D.Ga.1999). “Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on intangible factors.” Miller, 269 F.3d at 620.
“Because a defendant must demonstrate prejudice in a [post-conviction] proceeding, post-conviction relief based on a lawyer’s incompetence with regard to the composition of the jury is reserved for a narrow class of cases where prejudice is apparent from the record, where a biased juror actually served on the jury.”
Jenkins v. State, 824 So.2d 977, 982 (Fla. App.2002).
*473 With these principles in mind, this Court reviews each challenged juror.
A.
First, Perkins argues that counsel was ineffective for failing to challenge for cause or use one of his peremptory strikes to remove juror V.H. V.H. said during voir dire examination that she had been raped by her first cousin when she was 12 years old and that she had two daughters who had been raped. V.H. was extensively questioned and indicated that she could be impartial and base her decision on the evidence presented. At the evidentiary hearing, Steverson testified that he did not remember why they did not move to strike V.H., but added that when striking a jury it “depends on who else [is] on the jury” and who “may be better or worse choices.” (R. 249.) Smith testified that he could not remember why they did not strike V.H. but that “striking a jury is a weighing process, that you look at the positives and the negatives.... And sometimes you have people that you wouldn’t really want on there, but you don’t — you don’t end up striking them for other reasons.” (R. 441-42.)
This Court has examined the voir dire examination of the prospective jurors. The voir dire was extensive and consisted mainly of questions regarding the publicity surrounding the case and the prospective jurors’ views on capital punishment.[3] V.H. responded that she did not believe that the death penalty was a deterrent to crime, that she believed that a sentence of life in prison was warranted in some cases, that she would have to weigh all the evidence in regard to punishment, and that voting whether a defendant lived or died was a very grave responsibility. (Trial R. 1342.)
The Utah Court of Appeals discussed, in depth, the law related to ineffective assistance of counsel for failing to strike a prospective juror:
“We are unaware of, and defendant has not brought to our attention, any rule that automatically disqualifies prospective jurors who have been, or have friends or relatives who have been, victims of crimes similar to those at issue in the case where they might sit as jurors. Furthermore, cases in various state and federal jurisdictions demonstrate that when trial counsel allows the seating of jurors, who upon initial voir dire inquiry appear biased, courts deny the ineffective assistance claim unless counsel’s actions could not conceivably constitute legitimate trial tactics. See, e.g., Singleton v. Lockhart, 871 F.2d 1395, 1399-1400 (8th Cir.1989) (in capital murder case, relative of a murder victim was not actually biased and counsel’s failure to challenge him was tactical); Houston v. Nelson, 404 F.Supp. 1108, 1116 (C.D.Cal.1975) (in pre-Strickland [v. Washington, 466 U.S. 668 (1984),] case, where juror expressed ‘a particularly strong feeling against’ kidnapping, but gave assurances of ability to consider evidence fairly, counsel’s decision not to challenge was legitimate trial tactic); Ogle v. State, 807 S.W.2d 538, 541-42 (Mo.App.1991) (where juror in rape case said he ‘[p]robably would’ be able to set aside sister-in-law’s rape, decision not to challenge did not constitute ineffective assistance); Childers v. State, 764 P.2d 900, 904 (Okla.Crim.App.1988) (no ineffective assistance where unchallenged juror in rape case said she could set aside the fact a friend’s daughter was raped and murdered, even though she was afraid same could happen to her *474 daughter). Cf State v. Terry, 601 So.2d 161, 163-64 (Ala.Crim.App.1992) (where counsel testified at post-conviction hearing that he did not know how to strike jurors and juror who said she would side with the State remained unchallenged, defendant received ineffective assistance); Presley v. State, 760 S.W.2d 602, 604-608 (Mo.App.[1988]) (assistance ineffective where juror said he and family were crime victims and he would be partial, but counsel thought he said impartial, and failed to challenge), cert, denied, 488 U.S. 975, 109 S.Ct. 514, 102 L.Ed.2d 549 (1988).
“Because we ‘will not second-guess a trial attorney’s legitimate use of judgment as to trial tactics or strategy,’ State v. Pascual, 804 P.2d 553, 556 (Utah App.1991) (quoting State v. Wight, 765 P.2d 12, 15 (Utah App.1988)), we hold that counsel’s performance did not fall below an objective standard of reasonableness. Consequently, defendant fails to ‘overcome the strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment.’ State v. Bullock, 791 P.2d 155, 159-60 (Utah 1989), cert, denied, 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990).”
State v. Tenwyson, 850 P.2d 461, 469-70 (Utah Ct.App.1993).
Our research shows that other jurisdictions have found counsel’s performance deficient only after counsel failed to strike a juror who unequivocally stated that he or she was biased against the defendant and the juror was not rehabilitated.
“In Virgil \v. Dretke, 446 F.3d 598 (5th Cir.2006) ], the defendant was convicted by a jury that included two jurors, Roger Sumlin and Thomas Sims, who had expressly stated that they would be unable to be fair and impartial. We held that counsel’s failure to challenge for cause or peremptorily after Sumlin and Sims had offered unchallenged statements of bias constituted deficient performance under Strickland [v. Washington, 466 U.S. 668 (1984) ].”
Biagas v. Valentine, 265 Fed.App’x 166, 171-72 (5th Cir.2008) (not selected for publication in the Federal Reporter) (footnotes omitted). See Seigfried v. Greer, 372 Fed.App’x 536, 541 (5th Cir.2010) (not selected for publication in the Federal Reporter ) (“Because we have concluded that Juror 2 did not demonstrate actual bias, however, trial counsel’s failure to raise a for-cause challenge does not constitute error.”); Hughes, 258 F.3d at 462 (“When a venireperson expressly admits bias on voir dire, without a court response to follow-up, for counsel not to respond in turn is simply a failure ‘to exercise the customary skill and diligence that a reasonably competent attorney would provide.’ [Johnson v. Armontrout, 961 F.2d 748, 754 (8th Cir. 1992) ].”).
“In People v. Begay, 377 Ill.App.3d 417, 316 IlLDec. 574, 879 N.E.2d 962 (2007), the defendant challenged his trial attorney’s failure to seek removal of a juror for cause. During voir dire, the juror stated that her mother had been assaulted at knifepoint during a robbery. When the trial court asked the juror whether that experience would affect her ability to be fair and impartial, the juror said it would. The court then stated, ‘All right. So you wouldn’t be fair, either?’ The juror replied, ‘No.’ Id. at 423, 316 IlLDec. 574, 879 N.E.2d 962. In rejecting the defendant’s argument that her counsel’s performance was deficient under Strickland [v. Washington, 466 U.S. 668 (1984) ], the appellate court theorized that defense counsel could have believed that the juror would sympathize with the defendant, who claimed that when the offenses occurred, she *475 was being attacked by a knife-wielding aggressor.”
People v. Manning, 241111.2d 319, 336, 350 Ill.Dec. 262, 272, 948 N.E.2d 542, 552 (2011).
In this case, V.H. did not unequivocally state that she could not be impartial. Nor did V.H. testify at the postconviction evi-dentiary hearing about any perceived bias against Perkins. The record clearly shows that counsel was aware of V.H.’s history and that during voir dire counsel instead chose to concentrate on questions related to prejudicial pretrial publicity and the jurors’ views in support of capital punishment. Given that counsel stipulated that Perkins caused the victim’s death, counsel chose to focus on the penalty phase. During voir dire, V.H. indicated that she knew that sentencing Perkins would be a grave responsibility and that she did not believe that the death penalty was a deterrent. It is reasonable to conclude that counsel believed that this juror would be more favorable to a sentence of life in prison. Based on the record in this case, this Court agrees with the circuit court’s conclusion that Perkins failed to meet his burden of establishing that counsel was ineffective for not striking V.H. Specifically, he failed to show that counsel’s decision not to strike V.H. was anything other than a strategic decision.
“[The defendants’s] trial counsel did not simply ‘go through the motions’ in voir dire. He sought a change of venue, was successful in having potential jurors dismissed before voir dire based on their responses to the questionnaires, challenged jurors for cause during voir dire, and exercised five peremptory challenges. These strategic decisions were made based on his goal to educate the jury and choose a fair, impartial jury which would not be influenced by the publicity surrounding the case or by racial prejudice. This is not an unreasonable goal in choosing a jury, and trial counsel’s strategy in reaching that goal was not objectively unreasonable.”
Garcia v. State, 678 N.W.2d 568, 573 (N.D. 2004).
Perkins failed to satisfy the Strickland test in regard to V.H.; therefore, relief was correctly denied on this claim.
B.
Next, Perkins argues that his counsel was ineffective for failing to challenge for cause juror R.B.[4] Specifically, Perkins argues that R.B. said that he did not believe that victims had enough rights in this country; therefore, he argues, R.B. was biased in favor of the prosecution.
Steverson testified at the evidentiary hearing that he did not believe that R.B.’s response to the question concerning the rights of victims was sufficient to challenge R.B. for cause.
Our review of the lengthy voir dire examination shows that counsel actively participated in the voir dire process, that 88 jurors were on the venire, that the jurors completed juror questionnaires, and that the trial court granted 30 of counsel’s more than 40 challenges for cause. During voir dire, defense counsel asked the entire veni-re if they believed that victims in this country had enough rights. (Trial R. 637.) R.B. was one of 19 jurors who responded in the affirmative to this question. Counsel did move that R.B. be removed for cause based on his answers regarding pre *476 trial publicity in the case. That motion was denied. Counsel did not move to strike this juror based on his answer to the question concerning victims’ rights.
The trial record shows that R.B. said that he could presume that Perkins was innocent, that Perkins was not required to present any evidence, and that he could set everything aside except what the court instructed and be impartial. (R. 655; 674; 715.) R.B.’s juror questionnaire does not indicate any bias against Perkins. (Fourth Supp. R. 816.) Section 12-16-150(7), Ala. Code 1975, provides that a juror is subject to removal for cause if “he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.” Whether a juror thinks that victims do not have enough rights is a nonjudgmental observation and did not reflect a fixed opinion concerning Perkins’s guilt. “These answers would not have supported a challenge for cause, and therefore, trial counsel cannot be considered ineffective for failing to make such a challenge.” State v. Fry, 125 Ohio St.3d 163, 198, 926 N.E.2d 1239, 1277 (2010). “[Cjounsel could not be ineffective for failing to raise a baseless objection.” Bearden v. State, 825 So.2d 868, 872 (Ala.Crim.App.2001). Based on the record, this Court cannot say that counsel was ineffective for failing to challenge R.B. for cause.
C.
Perkins next argues that counsel was ineffective for failing to move that juror L.B. be removed for cause because L.B. indicated that Perkins must have done something wrong to be in court and because L.B. believed that defendants were treated too leniently.
At the evidentiary hearing, Steverson did not recall why he did not move to strike L.B. for cause. Steverson did say that he could not look at individual responses in isolation but that he had to consider that question in relation to other questions asked during voir dire.
The voir dire examination shows that L.B. was 1 of 30 jurors who responded in the affirmative when asked by defense counsel whether Perkins must have done something wrong to be in court. However, immediately after this question was asked, several jurors indicated that they did not understand the question, which was very lengthy, and defense counsel indicated that the question was confusing and he would ask a follow-up question — which he did. (Trial R. 653.) Counsel then asked if everyone believed that Perkins was presumed innocent, and L.B. indicated that he did.
Defense counsel also asked the entire venire whether they believed that people charged with crimes in this country were treated too leniently. Of the 88 jurors on the venire, 32 responded in the affirmative to this question. (Trial R. 640.)
The record shows that L.B. said that he would not consider anything except what was presented in the courtroom, that he could apply the law as instructed by the court, and that there was no reason he could not give Perkins a fair trial. L.B.’s juror questionnaire did not indicate any bias against Perkins. “[The prospective juror’s] answers would not have supported a challenge for cause, and therefore, trial counsel cannot be considered ineffective for failing to make such a challenge.” Fry, 125 Ohio St.3d at 198, 926 N.E.2d at 1277.
Counsel was not ineffective for failing to challenge L.B. for cause; therefore, Perkins failed to satisfy the Strickland test in regard to this claim.
D.
Perkins next argues that counsel was ineffective for failing to challenge ju *477 ror D.G. for cause because D.G. indicated that Perkins must have done something wrong to be in court and that she did not believe that victims had enough rights in this country. Steverson did not recall the voir dire examination of D.G.
As stated previously, the question concerning whether the jurors believed that Perkins had done something wrong to be in court was confusing. Thirty jurors responded affirmatively to this question, and several jurors indicated that they did not understand the question and that they were confused. Counsel stated on the record that his question was confusing and that he asked a follow-up question. Thereafter, D.G. responded that Perkins was presumed innocent.
Moreover, 19 jurors indicated that they did not believe that victims had enough rights,'and D.G. was one of those jurors. Simply responding to this question in the affirmative did not establish that D.G. was biased against Perkins.
Here, Perkins failed to establish that D.G. was biased; therefore, he failed to meet his burden of proving that counsel was ineffective in failing to move to strike D.G. for cause. Thus, relief was correctly denied on this claim.
E.
Perkins next argues that counsel was ineffective for failing to move that juror B.P. be removed for cause because, according to Perkins, B.P.’s answers to certain questions indicated that he was biased in favor of the State. Specifically, Perkins asserts that B.P. responded that Perkins must have done something wrong to be in court and that defendants were treated too leniently.
Steverson testified that he did not remember the voir dire of B.P. and that he did not believe that B.P.’s response to the question whether defendants were treated too leniently would have supported a strike for cause. (R. 242.) Steverson testified: “[I]f I don’t think I have a legitimate reason, I don’t do it.” (R. 242.)
The record shows that counsel challenged B.P. for cause based on his responses to voir dire questions concerning pretrial publicity. That motion was denied. B.P. specifically answered that he could set aside his personal beliefs, that Perkins was presumed innocent, and that he could follow the instructions of the court and the law. These answers rebut Perkins’s assertion that B.P. was biased.
Therefore, Perkins failed to meet his burden of proving that counsel was ineffective for failing to move to strike B.P. for cause. Relief was correctly denied on this claim.
F.
Perkins next argues that counsel should have moved that jurors J.T. and N.W. be removed for cause because they both indicated that people charged with crimes are treated too leniently.
The trial record shows that J.T. and N.W. indicated that they could follow the law and that they would consider mitigating circumstances if Perkins were convicted. Neither J.T.’s or N.W.’s juror questionnaire indicated any bias against Perkins.
Moreover, counsel was not questioned concerning their reasons for failing to move to strike J.T. and N.W. for cause.
“An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, ‘where the record is incomplete or unclear about [counselj’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.’ Williams *478 [v. Head,} 185 F.3d [1223,] 1228 [(llth Cir.1999)]; see also Waters [v. Thomas,] 46 F.3d [1506,] 1516 [(llth Cir.1995)] (en banc) (noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).”
Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (llth Cir.2000).
Here, Perkins failed to show that counsel was ineffective for failing to move to strike J.T. and N.W. for cause; thus, the circuit court did not abuse its discretion in denying relief.
IV.
Perkins next argues that counsel was ineffective for failing to request a limiting instruction on the jury’s use of Perkins’s two prior collateral charges of rape that were introduced at the guilt phase of his trial.
When addressing this claim, the circuit court stated:
“Trial counsel made a strategic decision not to request a limiting instruction regarding the introduction of collateral bad act evidence. The closing arguments of Mr. Smith and Mr. Steverson fully explained the burden of proof and the limited use of the prior conviction, and made use of the evidence in a manner they reasonably thought could be of value to [Perkins]. There is no evidence a limiting instruction from the court would have impacted the jury decision in any manner. Furthermore, under one case, a limiting instruction may not have been required as the evidence was not offered to challenge [Perkins’s] credibility.”
(R. 4493-94.)
The trial record shows that counsel was aware that he had a right to a limiting instruction on the use of the collateral-act evidence — if he requested one. (Trial R. 1705.) This issue was discussed several times during Perkins’s trial. Steverson testified at the evidentiary hearing that, although he was unsure, he thought they “made a decision not to ask for a limiting instruction.” (R. 233.) Counsel did indicate that in hindsight, he thought he should have requested the limiting instruction.[5]
During closing argument defense counsel argued that the State failed to prove that Perkins had the intent to commit capital murder. Counsel argued that the only evidence presented by the State was that Perkins had been charged with two other rapes, that the State had dismissed one of those charges, and that the jury should not convict Perkins based on an unrelated conviction. It appears that counsel made a strategic decision not to request a limiting instruction on the use of the collateral-act evidence — an instruction that would have emphasized that Perkins’s collateral bad acts were admissible to prove his intent.
As this Court stated in Burgess v. State, 962 So.2d 272 (Ala.Crim.App.2005):
“[I]n the context of a Rule 32 proceeding and defending a claim of ineffective assistance of counsel, counsel may make a strategic decision to not call attention to prior bad act evidence by not requesting a limiting instruction on the use of those acts. Though we have never addressed *479 this specific issue, many other jurisdictions have found that an attorney’s decision not to request a limiting instruction was a strategic choice that was not subject to attack in a Rule 32 petition. As the Ohio Court of Appeals stated in State v. Jones, (No. 20349, March 18, 2005) (Ohio Ct.App.2005) (unpublished):
“ ‘Jones argues that trial counsel was ineffective because he failed to ask for an other-acts limiting instruction regarding his prior criminal record. Counsel’s decision not to request a limiting instruction may have been a strategic decision in order to avoid drawing further attention to Jones’ criminal history. Trial strategy decisions will not be the basis of a finding of ineffective assistance .... Moreover, even if counsel should have requested a limiting instruction, Jones must still demonstrate that he was prejudiced by counsel’s failure in order to prevail upon an ineffective assistance of counsel claim .... [W]e conclude that it is unlikely that a lack of a limiting instruction caused the jury’s finding of guilt. In other words, we conclude that it is unlikely that Jones would have been acquitted if the instruction had been given.’
“In addressing this same issue the Supreme Court of California in People v. Hernandez, 33 Cal.4th 1040, 94 P.3d 1080, 16 Cal.Rptr.3d 880 (2004), stated:
“ ‘Defendants contend counsel were ineffective in not requesting a limiting instruction. “To establish ineffective assistance, defendant bears the burden of showing, first, that counsel’s performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel’s error, it is reasonably probable that the verdict would have been more favorable to him.” (People v. Hawkins, (1995) 10 Cal.4th 920, 940, 42 Cal.Rptr.2d 636, 897 P.2d 574.) .... On this record, we cannot say that counsel were deficient for not requesting a limiting instruction. “A reasonable attorney may have tactically concluded that the risk of a limiting instruction ... outweighed the questionable benefits such instruction would provide.” (People v. Maury (2003) 30 Cal.4th 342, 394, 133 Cal.Rptr.2d 561, 68 P.3d 1; see also Hawkins, supra, at p. 942, 42 Cal.Rptr.2d 636, 897 P.2d 574.)’
“Hernandez, 33 Cal.4th at 1052-53, 94 P.3d at 1088, 16 Cal.Rptr.3d at 889-90. See also Buehl v. Vaughn, 166 F.3d 163, 170 (3d Cir.1999) (‘In some circumstances, such an instruction may be strongly advisable; in others, counsel may reasonably conclude that it is strategically preferable to omit such a request since the instruction might have the undesired effect of highlighting the other crimes evidence.’); Commonwealth v. Delong, 60 Mass.App.Ct. 122, 132, 799 N.E.2d 1267, 1277 (2003) (‘We hold that it was a reasonable tactical decision not to request a limiting instruction, as such instructions typically highlight the permissible uses of evidence, as well as the limitations.’); Hudson v. State, 277 Ga. 581, 585, 591 S.E.2d 807, 811 (2004) (‘Hudson did not question his trial counsel regarding the reasons why counsel chose not to move for limiting instructions regarding the jury’s consideration of a certified copy of Hudson’s prior felony conviction. “In the absence of contrary evidence, defense counsel’s actions are presumed to be part of trial strategy.” ’ (quoting Thomas v. State, 268 Ga. 135, 139-40, 485 S.E.2d 783, 790 (1997))).”
962 So.2d at 285-86. See also Chapman v. State, 18 P.3d 1164, 1174 (Wyo.2001) *480 (“[T]he decision to request, or refrain from requesting, a limiting instruction is a tactical decision that this court will not second guess.”); Biggerstaff v. Clark, 999 F.2d 1153, 1155 (7th Cir.1993) (“Having lost the admissibility issue, it would be reasonable for counsel to choose not to request a limiting instruction, making a tactical decision to forgo the instruction....”).
Here, in closing arguments, counsel used the prior bad act evidence to “bolster [Perkins’s] defense.” See Commonwealth v. Delong, 60 Mass.App.Ct. 122, 131, 799 N.E.2d 1267, 1276 (2003). This Court agrees with the circuit court that Perkins failed to meet his burden of establishing that counsel was ineffective under Strickland. The record supports the circuit court’s conclusion that counsel made a strategic decision not to request a limiting instruction; therefore, the circuit court did not abuse its discretion by denying relief.
V.
Perkins next argues that counsel was ineffective for failing to investigate and to challenge, in a collateral proceeding, Perkins’s 1991 conviction in Fayette County for rape. Specifically, Perkins argues that this prior conviction was the only conviction used to support the aggravating circumstance that Perkins previously had been convicted of a crime involving the use or threat of violence, § 13A-5^49(2), Ala. Code 1975; thus, counsel was ineffective for failing to investigate that conviction.
When denying relief on this claim, the circuit court stated:
“Trial counsel had no duty or obligation to engage in a collateral challenge to [Perkins’s] Fayette County conviction for rape. Even if such a duty or obligation is found to exist, there is insufficient proof that the challenge would have been effective or meaningful as the evidence against [Perkins] in that case overwhelmingly established his guilt.”
(R. 4493.)
At the postconviction evidentiary hearing, Perkins introduced an affidavit executed by attorney Steven Nolen. Nolen wrote that he had been appointed to represent Perkins in two rape charges in Fay-ette County and that he had also represented Perkins’s uncle, who had been charged with hindering prosecution by assisting Perkins in avoiding apprehension for those rape charges. Nolen stated:
“On November 19, 1991, the day after Mr. Perkins pled guilty in case number CC-90-096, I represented Raymond Watkins [Perkins’s uncle] as he entered a plea of guilty in case number CC-90-128. In return for Mr. Watkins’s plea of guilty, the charge of hindering prosecution in the first degree, a felony, was reduced to hindering prosecution in the second degree, a misdemeanor.
[[Image here]]
“I have been shown by Mr. Perkins’s postconviction counsel two ‘waivers of conflict’ purportedly signed by Mr. Perkins and Mr. Watkins, both dated November 19,1991, and both witnessed and notarized by me on that day. I have no independent recollection of any other conversations with either Mr. Perkins or Mr. Watkins regarding any possible conflict of interest in my representation of them. When I state that I have no independent recollection, it does not mean that there could not have been other conversations with either Mr. Perkins or Mr. Watkins regarding any possible conflict; it means I do not remember one way or the other. I believe that the court may have required some type of written waiver before accepting Mr. Watkins’s plea on November 19, 1991, and that was the reason I secured the waivers. However, I do not have a clear *481 recollection of the court requiring a written waiver prior to accepting Mr. Watkins’s plea of guilty in case number CC-90-128.”
(C.R.5233.)
At trial, when proof of Perkins’s 1991 guilty-plea conviction for rape was introduced during the penalty phase, Stever-son objected, stating that the waiver of conflict of counsel was dated the day after Perkins pleaded guilty.[6] The court overruled counsel’s objection. Steverson testified at the evidentiary hearing that he did not challenge Perkins’s rape conviction by filing a postconviction petition in Fayette County and that he had never filed a postconviction petition attacking one of his client’s prior convictions. The trial record also shows that extensive testimony was introduced at the guilt phase concerning Perkins’s 1991 conviction. The victim testified, in depth, concerning the facts surrounding the conviction. The record affirmatively shows that counsel was not ignorant concerning the facts and circumstances of Perkins’s 1991 rapé conviction.
In Hamm v. State, 913 So.2d 460 (Ala. Crim.App.2002), we addressed a similar issue and stated:
“Hamm contends, in the alternative, that trial counsel’s performance was deficient because he ‘could, have challenged the Tennessee convictions in Tennessee courts and had the courts address the merits of the claims in 1987.’ (Hamm’s brief at p. 25)(emphasis in original). Hamm’s assertion that Alabama trial counsel had a duty to challenge in a Tennessee court the merits of the nine-year-old convictions so that he could then prevent consideration of the prior convictions at the 1987 capital sentene-ing hearing is not supported by any legal authority.”
913 So.2d at 479 (emphasis in original).
Our neighboring State of Georgia in Barker v. Barrow, 290 Ga. 711, 723 S.E.2d 905 (2012), addressed whether counsel was ineffective for failing to research a prior guilty-plea conviction the State intended to use to enhance the defendant’s sentence. That court, in declining to find counsel ineffective, stated:
“Barker maintains that his trial counsel’s performance was deficient because counsel failed to adequately investigate the validity of his prior guilty pleas in that counsel did not review transcripts of the plea colloquies, which he claims would have revealed the pleas’ constitutional defects. Relying principally upon Rompilla v. Beard, 545 U.S. 374, 377, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), Barker urges that, given the State’s notification that it would seek to enhance his sentence by his prior pleas, his trial counsel had a basic legal duty to retrieve and read the plea transcripts.
“Certainly, as Barker maintains, trial counsel has the obligation to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. Terry v. Jenkins, 280 Ga. 341, 346(2)(c), 627 S.E.2d 7 (2006). But, in any case in which the ineffectiveness of counsel for inadequate investigation is claimed, the reasonableness of a particular decision not to investigate in the manner urged must be assessed in light of all the circumstances at that time, and such assessment must include a heavy measure of deference to counsel’s judgments. Id. at 347(2)(c), 627 S.E.2d 7.
*482 “The decision in Rompüla v. Beard, does not alter this. The Supreme Court expressly held that ‘when a capital defendant’s family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.’ 545 U.S. at 377, 125 S.Ct. 2456. The Court explained that its analysis did not create a “‘rigid, per se” rule that requires defense counsel to do a complete review of the file on any prior conviction introduced.’ Id. at 389, 125 S.Ct. 2456. Instead, it found counsel in that case lacking for failing to make reasonable efforts to review the file of the defendant’s pri- or conviction despite knowledge that the prosecution intended to introduce Rom-pilla’s prior conviction not ‘merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case.’ Id. Thus, unlike the present case, there was no viable substitute for retrieval and examination of the damaging testimony itself. Moreover, the Court noted that the found unreasonableness of not securing the actual file for review ‘was heightened by the easy availability of the file,’ and the ‘great risk that testimony about a similar violent crime would hamstring counsel’s chosen defense of residual doubt.’ The Supreme Court expressly cited these circumstances as rendering unacceptable the conclusion that Rom-pilla’s ‘counsel could reasonably decline to make any effort [whatsoever] to review the file.’ Id. at 389-390, 125 S.Ct. 2456. The Court expressly acknowledged that in situations in which the prosecutor does not intend to use a defendant’s prior conviction in the manner as in Rompüla v. Beard, a different assessment of reasonableness might well be warranted. Id. at 390, 125 S.Ct. 2456. And, so it is in this case.
“In the present order denying Barker the sought relief, the habeas court made relevant findings in regard to the issue of the reasonableness of trial counsel’s investigation, including but not limited to: trial counsel, who had been a member of the Georgia bar since 1991, was on a list of appointed counsel and had done predominantly criminal work; at the time of representing Barker, counsel had been second defense chair at criminal jury trials and had handled at least 100 guilty pleas; prior to representing Barker, counsel had handled a similar case involving a defendant’s exposure to punishment of life without the possibility of parole based upon a drug statute; it was obvious to counsel that the State intended to pursue recidivist treatment, if possible, as the charging instrument referenced Barker’s prior convictions; counsel researched Barker’s previous pleas, which involved counsel physically going to the clerk’s office, taking the list of prior convictions, and reviewing every file to see if a certified copy of each previous conviction existed; counsel was able to verify that the pleas were ‘factually entered’; the pleas were purportedly signed by Barker, and entered in the court record as part of the clerk’s file; during consultation with Barker, counsel discussed the gravity of Barker’s situation arising from his prior convictions; counsel’s normal practice was to go over a defendant’s possible punishment, including the impact of any previous convictions; counsel sent Barker a letter outlining the way he would be sentenced based upon his prior convictions; counsel was confident that Barker was aware of the trial court’s lack of discretion in sentencing should Barker be convicted; *483 Barker was very helpful in trying to think of things with which to differentiate his case from others in order to avoid a sentence of life without parole, but he never made any claim that his prior convictions were improper; and the issue of possible irregularity with any of the prior pleas had never arisen until it was raised by Barker’s habeas counsel. What is more, evidence of a routine or standard practice or procedure of the court in which the pleas are entered can be used in demonstrating compliance with constitutional standards. Bazemore v. State, 273 Ga. 160, 162(1), 535 S.E.2d 760 (2000); Jackson v. Hopper, 243 Ga. 41, 42, 252 S.E.2d 467 (1979). And, the habeas court additionally found that trial counsel had experience with guilty pleas in the county of Barker’s prior convictions and with the judge who sentenced Barker in conjunction with his prior guilty pleas: counsel practiced before that judge from 1991 until the judge’s death approximately ten years later, and spent an extensive amount of time in various capacities in front of that judge; the judge had a standard way of doing things, including a normal routine with handling guilty pleas; in fact, a written checklist of the Boykin rights was kept in the courtroom.
“The habeas court found no requirement that trial counsel research every aspect of the colloquy of each of Barker’s prior guilty pleas, and based upon the circumstances of record, concluded that trial counsel was not ineffective as counsel had made reasonable efforts to obtain and review Barker’s prior convictions to ensure their validity. This Court likewise declines to, as Barker in essence urges, impose an absolute duty upon defense trial counsel when representing a recidivist to retrieve and review transcripts of prior plea proceedings or otherwise be deemed ineffective. This is not only unwarranted as a matter of law, but in many instances, would prove unworkable as a matter of fact.”
290 Ga. at 713-15, 723 S.E.2d at 908-09.
The analysis used by the Supreme Court of Georgia is applicable to the facts in this case. In this case, the facts surrounding Perkins’s 1991 rape conviction were introduced, in depth, during the guilt proceedings. Counsel was not ineffective for failing to “research every aspect” and challenge Perkins’s 1991 conviction by filing a collateral proceeding in another county during Perkins’s capital-murder proceedings. See Barker v. Barrow. Based on the record in this case, we cannot say that counsel’s actions were unreasonable.
Moreover, at the penalty phase of Perkins’s trial, the State introduced evidence that Perkins had a 1983 conviction for second-degree rape and a 1991 conviction for first-degree rape. On direct appeal, Perkins argued that his two prior convictions had been improperly used to support the aggravating circumstance that Perkins had previously been convicted of a crime of violence. Perkins, 808 So.2d at 1121-22. Contrary to Perkins’s assertions, his 1991 conviction was not the only conviction used to support the aggravating circumstance that he had previously been convicted of a crime of violence. At the penalty phase, testimony was presented that in 1983 Perkins was convicted of raping a mentally deficient 14-year-old girl. A “crime of violence” is defined in § 13A-11-70, Ala. Code 1975, as: “Any of the following crimes or an attempt to commit any of them, namely, murder, manslaughter (except manslaughter arising out of the operation of a vehicle), rape, mayhem, assault with intent to rob, assault with intent to ravish, assault with intent to murder, robbery, burglary, kidnapping and larceny.”
*484 Perkins’s 1983 conviction for rape in the second degree was sufficient, in itself, to support the aggravating circumstance that Perkins had previously been convicted of a crime of violence. See Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999). Thus, Perkins failed to show how he was prejudiced by counsel’s failure to specifically challenge his 1991 conviction for rape. Perkins failed to meet his burden of proving ineffective assistance of counsel in regard to this claim, and relief was correctly denied.
VI.
Perkins next argues that his trial counsel was ineffective for failing to investigate and present mitigation evidence and for failing to explain the significance of the mitigating evidence that was presented. Specifically, Perkins argues that counsel presented a “limited mitigation case,” that counsel failed to present other available mitigation, and that counsel’s presentation of the mitigation it did present was deficient.
In its order denying relief on this claim, the circuit court stated:
“After considering all of the arguments and testimony of the attorneys, experts, and family members, the evidence does not establish that trial counsel were ineffective in any aspect of the penalty phase of the proceedings. The mitigating evidence that allegedly was not presented was cumulative to the materials presented during the penalty phase. It is apparent that [Perkins’s] trial attorneys were able to adequately present the mitigating circumstances in an effective manner, as the trial and sentencing judge expressly recognized and found the evidence to be mitigating in its Sentencing Order:
“ ‘The Court considers the following non-statutory mitigating circumstances to exist:
[[Image here]]
“ ‘(3) [Perkins] suffers from borderline personality disorder, is an alcoholic, is of borderline intelligence, and probably has organic brain dysfunction.
“ ‘(4) [Perkins] was under mental or emotional disturbance, although not to an extreme degree.
“ ‘(5) [Perkins] lacked socialization and had a horrible childhood, involving the death of his father, the drowning of his brother in his presence, the sexual abuse of his sister by his stepfather in his presence, physical abuse of [Perkins] by his stepfather, [running] away from home at a very early age and being sexually abused.
“ ‘(6) [Perkins] and his family were very poor, and [Perkins] had to “raise himself.” His mother and stepfather and other family members were alcoholics.
“‘The Court considered all of the evidence as to nonstatutory mitigating circumstances, including the testimony of Mr. Ed Owens, Dr. John Goff and Ms. Kathleen Snow, the presen-tence investigation, the videotape offered by [Perkins] and all other evidence submitted on circumstances of [Perkins’s] life, childhood, poor housing, and family background. The Court carefully searched for and considered all evidence in this case for circumstances of mitigation because this is a capital murder case. (Sentencing order of Judge Lake, pp. 8-9.)’
“The affidavit of Kathy Hocutt, [Perkins’s] sister, was received into evidence during the Rule 32 proceedings for the purpose of evaluating the claim that the *485 trial attorneys were deficient in the presentation of mitigation evidence. From this affidavit and from the supporting affidavit of Dr. Susan Strickland, it was established that Ms. Hocutt was not available to trial counsel to testify in 1994 and would not have testified in .person even if asked. Therefore, trial counsel could not have called her at trial, but could only have conceivably attempted to convince the trial judge to permit an affidavit from Ms. Hocutt. This case was decided prior to the adoption of the Alabama Rules of Evidence, which specifically permit hearsay to be considered at sentencing. It was still possible, however, for hearsay to be accepted by the trial judge at the time of [Perkins’s] sentencing....
“Thus, it is conceivable that the trial judge here could have permitted some type of hearsay to be admitted. It is not established, however, that the trial judge would have accepted such an affidavit from Kathy Hocutt. Even if it had been accepted, it would have [been] cumulative at best based on the other evidence presented.
“The evidence presented regarding the management and presentation of expert witnesses did not establish that counsel were ineffective, but instead consisted of ‘second-guessing’ the decisions made. The evidence does not establish that [Perkins’s] trial attorneys were ineffective in the investigation or presentation of mitigating evidence or in any aspect of the penalty phase areas, nor is there evidence that any alleged deficiencies were prejudicial to [Perkins].”
(C. 4494-96.)
In regard to counsel’s duty to investigate, this Court has explained:
“While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty only requires a reasonable investigation.’ Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.1988), cert, denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Stride-land [u Washington ], 466 U.S. [668,] 691, 104 S.Ct. [2052,] 2066 [(1984)]; Morrison v. State, 551 So.2d 435 (Ala. Cr.App.1989), cert, denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into ■ each of the plausible lines of defense.’ Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation. is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’ Id., 466 U.S. at 686, 104 S.Ct. at 2063.
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.’
“Id., 466 U.S. at 691, 104 S.Ct. at 2066.” Jones v. State, 753 So.2d 1174, 1191 (Ala. Crim.App.1999).
As stated above, both of Perkins’s trial attorneys, Dennis Steverson and James Smith, testified at the postconviction evi-dentiary hearing.
Steverson testified that he had been admitted to the Alabama State Bar in 1982, that he was appointed to represent Perkins in April 1993, and that approximately 40% of the cases he handled were criminal cases. He testified that he and Smith filed *486 a motion for investigative expenses. That motion was granted, and he and Smith retained the services of Ed Owens, a social worker; Dr. John Goff, a neuropsychologist; and Alan Kofman, a private investigator. Steverson said that he met with Perkins on April 12, 1993; on December 8, 1993; on December 21,1993; on March 24, 1994; and on April 13, 1994. In regard to their trial strategy, he testified:
“[0]ur strategy was to try to save [Perkins’s] life. We figured that the publicity surrounding [Perkins] and the fact of all these prior crimes coming in, that the best we could do was try to hold down the emotional impact that the jury might have. And, therefore, we made the decision to admit, based upon what [Perkins] told us, that he had committed the murder, in hopes that that might help us save his life rather than try to contest the fact of the murder. And so that was basically our strategy, to try to save his life by holding down the emotional elements of all — of everything that we had to deal with.”
(R. 273.) They did not concede that Perkins was guilty of capital murder, Stever-son said, and they argued that there was no medical evidence indicating that Gilliam had been raped and that Perkins did not intend to commit murder. They called Perkins’s aunt to testify at the penalty phase because, he said, they wanted a family member to testify. Other family members were not called at trial, he said, because counsel did not believe that their testimony would be helpful since the family was not close and Perkins had been “accused of doing some things to his own family.” (R. 275.) Counsel said that he thought that Perkins had been accused of “doing things” to his own daughter and his cousin.
Smith testified that he had been admitted to the Alabama State Bar in 1982, that he was appointed to represent Perkins in April 1994, and that 60% of his practice involved criminal cases. On his attorney-fee declaration, he billed 96 hours for out-of-court work on Perkins’s case. Smith contacted the Southern Center for Human Rights to obtain information related to preparing for a capital-murder trial. Trial counsel met with Perkins, where he was incarcerated, several times before trial but, he said, “during the first part of our meetings with Mr. Perkins, he' appeared to be intoxicated.” (R. 470.) He and Stever-son went to the murder scene and spoke with many fact witnesses and anyone else who would speak with them.
“Although Petitioner’s claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.” Chandler v. United States, 218 F.3d 1305,1320 (11th Cir.2000).
The trial record shows that at Perkins’s sentencing-hearing counsel presented the testimony of Kathleen Snow, Perkins’s paternal aunt, Ed Owens, and Dr. Goff. Snow testified that Perkins’s father was murdered soon after Perkins was born and that Perkins lived with his mother in a run-down shack in Berry, Alabama. According to Snow, Perkins was on his own for most of his childhood. Snow stated that Perkins did not have a “good mother” — that his mother was an alcoholic who stayed drunk most of the time. The testimony established that Perkins’s stepfather began sexually abusing Perkins’s sister when she was six years old and that Perkins witnessed the abuse. Counsel presented evidence indicating that Perkins frequently had to steal food to survive, that Perkins slept outside the house because his stepfather was cruel to him, that his grandmother tried to get custody of Perkins but was told that she would not get custody unless she could prove that Perkins’s sister was being abused. Coun *487 sel also presented evidence that when Perkins was 7 years old he was sexually abused by a man in Berry and that Perkins married when he was 16 years old.
Owens testified that he compiled a social history and assessment on Perkins, that he spoke to Perkins, his aunts, other relatives, and his paternal grandmother, and that he reviewed medical records and court records. According to Owens, Perkins was raised in poverty, he was chased out of the house by his stepfather when he was 7 years old, and his stepfather fired a gun over his head. Perkins often slept in vehicles, and when forced to leave the house, he would sometimes crawl back into the house at night through a loose board in the floor so that his stepfather did not know he was there. Owens stated that Perkins had been sexually abused by a member of the Berry community when he was young and that his family had a history of alcohol abuse. When asked his assessment of Perkins, Owens testified:
“Well it sounds as if he grew up with very little, if any, nurturing or support. Descriptions were that he was out of home more than he was there from the time he was seven years of age on up. There would have been more than likely very little bonding with the primary care giver. And because of the fact that he was not receiving the nurturing that he needed during the early years, I would feel there would be delays at best in his developmental stages, probably some areas of deficit, things like empathy, social [conscience], a sense of right and wrong. Problem solving skills would probably be weak.
[[Image here]]
‘Well he would have a — like I say have — difficulties empathizing with other people. He would have problems handling aggressive behavior, poor impulse control, poor interpersonal skills. The environment that he grew up in would — as described would — tend to socialize him to accept violence as a normal and acceptable behavior as a way to deal with problems, as a method of problem solving.”
(Trial R. 2838-34.)
Dr. Goff testified that he completed a battery of neuropsychological tests on Perkins. It was his opinion that Perkins had a borderline personality disorder and antisocial personality disorder. He explained:
“Borderline personality disorder is considered to be one of three severe personality disorders. And it can be a disabling disorder. And most people think ... that it’s actually a level of personality developed; that is to say that the person hasn’t really developed a personality. And so the symptoms that you see are based on more a question of arrested development than actually the development of a maladaptive kind of pattern. So there are a number of criteria that have to be met. And they essentially amount to difficulties in terms of identity, people don’t ever really have a good idea of who they are or what they want to do or who they want to be. They tend to have a great deal of difficulty in controlling their emotions. We call it, affect, word we use for emotion. They demonstrate sometimes what’s called emotional flooding. They have a lot of problems with interpersonal relationships. That is to say that they either over idealize their relationship or then when the relationship really gets terrible and they denigrate it — this real up and down stuff — they have a tendency towards suicidal gestures and suicidal attempts. Many of them will engage in what we call delicate selfcutting. They cut themselves a lot. You see a lot of that in a prison situation. And they *488 tend to be generally when not in a controlled situation tend towards volatility.”
(Trial R. 2871-72.) Perkins, he said, exhibited many of these symptoms. Dr. Goff explained that an antisocial personality is a person who has failed to develop “one particular aspect of personality” — a conscience. Dr. Goff also testified that Perkins’s full-scale IQ was 76.
In closing arguments, counsel argued that Perkins’s childhood was marked by poverty, abuse, and neglect; that he had borderline intellectual functioning; that he never developed normally because of his heinous childhood; that the jury should consider residual doubt; and that the jury should show Perkins mercy.
In the postconviction proceedings, none of Perkins’s family members testified at the evidentiary hearing. Kathy Hocutt, Perkins’s older sister, executed an 18-page affidavit that was admitted at the hearing. In the affidavit, Hocutt gave a detailed account of the abuse she suffered at the hands of her stepfather and the poverty that marked Perkins’s childhood. Her affidavit was, in large part, cumulative to testimony that had been presented at Perkins’s sentencing hearing.
Dr. Susan Strickland, a licensed social worker with the Georgia Department of Corrections, testified that she had conducted a clinical interview of Perkins. Her testimony was largely cumulative to Owens’s trial testimony. However, Strickland testified in depth concerning how Perkins’s traumatic childhood affected his development.
Owens testified at the postconviction hearing that Smith had retained him to work on Perkins’s case and to help him in preparing for the penalty phase of Perkins’s trial. His notes regarding Perkins’s case had been destroyed in a tornado that hit his house, and he could not recall whom he had interviewed to complete his assessment. He did talk to Perkins, two of Perkins’s aunts, and his paternal grandmother. Again, he said, he could not testify as to what they told him because his notes had been destroyed. Owens’s billing records showed that he spent 60 hours on Perkins’s case. Smith, he said, provided him with a box of Perkins’s records, which included his medical records. Owens did testify that much of the information he obtained was from Perkins’s family members. Some school records had not been provided to him, he said, and he did not talk to Perkins’s sister. Owens testified:
“[Assistant attorney general]: And had you seen the school records, do you feel like that would have substantially changed your assessment of Mr. Perkins?
“[Owens]: No. As I said, it would have made me substantiate its — you know; made me feel more comfortable in some of the thing that I was seeing.
“[Assistant attorney general]: But it would have been fairly cumulative— “[Owens]: Yes.”
(R. 327.)
Dr. Goff also testified at the postconviction hearing that he had been retained three months before trial to do psychological tests on Perkins and that he did not receive any information until three weeks before trial. To complete his evaluation, he administered many psychological tests to Perkins and talked to Perkins’s aunt, Kathleen Snow. Dr. Goff testified that Perkins told him that the only “person that Mr. Perkins could come up with was his aunt.” (R. 344.) Dr. Goff testified that he was furnished numerous documents but that he did not have Perkins’s school records.
At the postconviction evidentiary hearing, the State presented the testimony of Dr. Glen King, a clinical and forensic psy- *489 ehologist. Dr. King testified that he conducted a clinical assessment of Perkins and that it was his opinion that Perkins understood the difference between right and wrong.
Perkins asserts that counsel’s manner of presenting the mitigating evidence at the sentencing hearing was ineffective.
“ ‘Generally, the decision of what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy. State v. Keith (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Moreover, debatable trial tactics generally do not constitute ineffective assistance of counsel. [State w.] Clayton, 62 Ohio St.2d [45,] 49, 402 N.E.2d 1189 [ (1980) ]. This court must indulge in a strong presumption that trial counsel’s conduct falls within the wide range of reasonable professional assistance. [State u] Hartman, 93 Ohio St.3d [274,] 300, 754 N.E.2d 1150 [ (2001) ]. Significantly, the existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel. [State u] Combs, 100 Ohio App.3d [90,] 105, 652 N.E.2d 205 [ (1994) ].’ ”
Phillips v. Bradshaw, 607 F.3d 199, 206-07 (6th Cir.2010) (quoting State v. Phillips, No. 20692, Feb. 27, 2002 (Ohio Ct.App.) (not reported in N.E.2d)). “As a matter of trial strategy!,] counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias.” Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995). “The decision to call family members as witnesses [in mitigation] is a ‘strategic decision.’ ” Fretwell v. Norris, 133 F.3d 621, 627 (8th Cir.1998) (citing Guinan v. Armontrout, 909 F.2d 1224, 1231 (8th Cir.1990), cert, denied, 498 U.S. 1074, 111 S.Ct. 800,112 L.Ed.2d 861 (1991)).
As noted above, the only evidence presented at the postconviction evidentiary hearing concerning additional mitigation that could have been presented by Perkins’s family members was evidence introduced in the form of an affidavit executed by Perkins’s sister. In discussing the reliability of affidavits in postconviction proceedings, the United States Court of Appeals for the Eleventh Circuit has aptly stated:
“Present counsel have proffered affidavits from Williams’ father and sister which, if believed, indicate that they could have provided additional mitigating circumstance evidence if they had been called as witnesses. It is not surprising that they have done so. Sitting en banc, we have observed that ‘[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called,’ but ‘the existence of such affidavits, artfully drafted though they may be, usually proves little of significance.’ Waters [v. Thomas ], 46 F.3d [1506,] 1513-14 [ (11th Cir.1995) ]. Such affidavits ‘usually prove[ ] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.’ Id. at 1514.
[[Image here]]
“Even putting the overwhelming disparity of resources to the side, we have recognized that ‘ “[i]n retrospect, one may always identify shortcomings,” but perfection is not the standard of effective assistance.’ [46 F.3d at 1514] (quoting from Cape v. Francis, 741 F.2d 1287, 1302 (11th Cir.1984)). As we held in Atkins v. Singletary, 965 F.2d 952, 960 *490 (11th Cir.1992), ‘A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.’ And in Waters we explicitly reiterated that: ‘The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.’ Waters, 46 F.3d at 1514 (quotation and citation omitted); accord, e.g., Provenzano [v. Singletary ], 148 F.3d [1327,] 1333 [ (11th Cir.1998) ].”
Williams v. Head, 185 F.3d 1223, 1236 (11th Cir.1999).
Here, Perkins failed to establish that counsel’s investigation into or presentation of mitigation evidence relating to his life, his background, or the crime was deficient or that he was prejudiced under Strickland. Accordingly, the circuit court did not abuse its discretion by denying relief on that ground.
Likewise, Perkins failed to prove that counsel was ineffective for relying on the mental evaluation conducted by Dr. Goff even though Perkins challenged the sufficiency of that evaluation in the postconviction proceeding.
“[D]efense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire. See State v. Sired, 502 So.2d 1221, 1223 (Fla.1987). Even if the evaluation by [a retained mental-health expert], which found no indication of brain damage to warrant a neuropsychological workup, was somehow incomplete or deficient in the opinion of others, trial counsel would not be rendered ineffective for relying on [the expert’s] qualified expert evaluation.”
Darling v. State,- 966 So.2d 366, 377 (Fla. 2007).
Counsel relied on the experts they retained to do a great deal of the investigation in this case. “In Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007), this Court found that Hall was not deprived of the effective assistance of counsel when counsel delegated the responsibility for investigating the case to a subordinate.” Washington v. State, 95 So.3d 26, 41 (Ala.Crim. App.2012). “[T]rial counsel’s reliance on his retained experts is not proven unreasonable simply because another expert ... questions the thoroughness of the prior evaluations.” Stewart v. State, 37 So.3d 243, 252-53 (Fla.2010). “Counsel cannot be deemed ineffective under the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), simply because he relied on what may have been less than complete pretrial psychiatric evaluations.” State v. Sired, 502 So.2d 1221, 1223 (Fla.1987). “[T]his Court has held that ‘even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.’” Lynch v. State, 2 So.3d 47, 71 (Fla.2008) (quoting Darling v. State, 966 So.2d 366, 377 (Fla.2007), citing in turn Gudinas v. State, 816 So.2d 1095, 1106 (Fla.2002); Sweet v. State, 810 So.2d 854, 863-64 (Fla. 2002)).
Here, Perkins failed to present sufficient evidence to establish that counsel was ineffective for relying on experts. Accordingly, the circuit court did not abuse its discretion by denying relief on this claim.
To the extent Perkins asserts that counsel failed to provide testimony that explained the mitigation evidence that was presented, this- claim is also without merit. As stated above, Owens testified that people with Perkins’s history have delays in developmental stages, delays in problem *491 solving, and no sense of right or -wrong. Dr. Goff testified that Perkins had a borderline personality disorder and that he had difficulty in controlling his emotions. He further testified that Perkins had an antisocial disorder and that an aspect of that type personality is that the person fails to develop a conscience.
This is not a case where counsel failed to conduct any investigation or where counsel failed to present any significant mitigation evidence. Counsel’s manner of presenting mitigation evidence was a matter of trial strategy. See Hertz v. State, 941 So.2d 1031,1044 (Fla.2006).
Moreover,
“In assessing claims of ineffective assistance of counsel in the penalty phase of a capital trial, we apply the standard discussed in Wiggins v. Smith, 589 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):
“Tn Strickland [u Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a “defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id., at 694,104 S.Ct. 2052, 80 L.Ed.2d 674. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.’
“539 U.S. at 534,123 S.Ct. 2527.”
McWhorter v. State, 142 So.3d 1195, 1250 (Ala.Crim.App.2011).
In sentencing Perkins to death, the circuit court found the existence of three statutory aggravating circumstances: (1) that the murder was committed during the course of a kidnapping, § 13A-5-49(4), Ala.Code 1975; (2) that the murder was committed while Perkins was under a sentence of imprisonment, § 13A-5-49(l), Ala. Code 1975; and (3) that Perkins had previously been convicted of felony involving the use or threat of violence to another person, § 13A-5-49(2), Ala.Code 1975. As statutory mitigation, the circuit court found that Perkins’s capacity to appreciate the criminality of his conduct was substantially impaired, see § 13A-5-51(6), Ala. Code 1975. The circuit court found the following nonstatutory mitigating circumstances to exist:
“(1) that Perkins took Mrs. Gilliam to the Hood residence after shooting her; (2) that Perkins was drinking and taking drugs during the timeframe within which the offense was committed; (3) that Perkins suffers from borderline personality disorder, is of borderline intelligence, and possibly has organic brain dysfunction; (4) that Perkins was under some degree of mental or emotional disturbance, although not an extreme degree; (5) that Perkins had a traumatic childhood and lacked socialization; (6) that Perkins’s IQ is 76; and (7) that Perkins’s family was poverty-stricken when he was growing up.”
Perkins, 808 So.2d at 1141 — 42.
This Court has thoroughly reviewed both the mitigation evidence presented at Perkins’s sentencing hearing and the alleged omitted mitigation evidence and is confident that the omitted mitigation was, in large part, cumulative to the testimony that was presented at Perkins’s sentencing hearing and would not have affected the jury’s recommendation of death in this case. Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
Accordingly, this Court cannot say that counsel’s actions were deficient or that Perkins suffered any prejudice as a result of counsel’s actions. Because Perkins failed to prove that counsel were ineffec *492 tive in relation to their mitigation investigation and presentation, the circuit court did not abuse its discretion by denying relief.
VII.
Perkins next argues that this Court should analyze the ineffective-assistance-of-counsel claims cumulatively and find reversible error.
As this Court has stated:
“Other states and federal courts are not in agreement as to whether the ‘cumulative effect’ analysis applies to Strickland [v. Washington, 466 U.S. 668 (1984) ] claims. As the Supreme Court of North Dakota noted in Garcia v. State, 678 N.W.2d 568, 578 (N.D.2004):
“ ‘Garcia argues that even if trial counsel’s individual acts or omissions are insufficient to establish he was prejudiced, the cumulative effect was substantial enough to meet Strickland’s, test. See Williams v. Washington, 59 F.3d 673, 682 (7th Cir.1995) (“In making this showing, a petitioner may demonstrate that the cumulative effect of counsel’s individual acts or omissions was substantial enough to meet Strickland’s test”); but see Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (“cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own”).’
“See also Holland v. State, 250 Ga.App. 24, 28, 550 S.E.2d 433, 437 (2001) (‘Because the so-called cumulative error doctrine is inapplicable, each claim of inadequacy must be examined independently of other claims, using the two-prong standard of Strickland v. Washington.’ (footnote omitted)); Carl v. State, 234 Ga.App. 61, 65, 506 S.E.2d 207, 212 (1998) (‘Georgia does not recognize the cumulative error rule.’); Fisher v. Ange-lone, 163 F.3d 835, 852 (4th Cir.1998) (‘Not surprisingly, it has long been the practice of this Court to individually assess claims under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir. 1986) (considering ineffective assistance claims individually rather than considering their cumulative impact.).’).
“We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel. However, the Alabama Supreme Court has held that the cumulative effect of prosecutorial misconduct necessitated a new trial in Ex parte Tomlin, 540 So.2d 668, 672 (Ala.1988) (‘We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings.’). Also, in Ex parte Bryant, [951 So.2d 724] (Ala.2002), the Supreme Court held that the cumulative effect of errors may require reversal.
“If we were to evaluate the cumulative effect of the ineffective assistance of counsel claims, we would find that Brooks’s substantial rights were not injuriously affected. See Bryant and Rule 45, Ala. R.App. P.”
Brooks v. State, 929 So.2d 491, 514 (Ala. Crim.App.2005).
If this Court were to evaluate the cumulative effect of the ineffective-assistance-of-counsel claims, it would hold that Perkins is not entitled to any relief. Perkins failed to prove that counsel’s performance was deficient. Further, viewing all the actions Perkins alleges counsel should have taken, this Court concludes that Perkins failed to show that he was prejudiced. Conse *493 quently, the circuit court did not abuse its discretion by denying relief on this claim.
VIII.
Perkins next argues that the circuit court erred in denying his claim that the jurors engaged in premature deliberations during the penalty phase. Specifically, in his postconviction petition, Perkins asserted that the jurors had made up their minds to recommend a death sentence after the guilt phase but before they heard the testimony at the penalty phase.
The circuit court, when denying relief on this claim, stated:
“There was insufficient proof that the jurors failed to follow the instructions of the court regarding deliberations, and there is insufficient evidence that the jury reached any decision regarding the penalty during the guilt phase. Therefore, this claim is denied.”
(C. 4551.)
In support of this claim, Perkins presented the testimony of J.T., a juror on Perkins’s case. A review of J.T.’s testimony shows that J.T. did not remember everything that had happened at Perkins’s trial 14 years ago and that he was very confused. The following occurred during cross-examination:
“[Assistant attorney general]: During the guilt phase of the trial,—
“[J.T.]: Uh-huh.
“[Assistant attorney general]: — the judge instructed you that you were to find him guilty or not guilty of capital murder; is that right?
“[J.T.]: Right.
“[Assistant attorney general]: Did the judge tell you that you were to consider his sentence of death at that time?
“[J.T.]: No, not at that time, only for us to go back to see if he was guilty. Not at that time.
“[Assistant attorney general]: You told me the other night on the phone that—
“[J.T.]: Uh-huh.
“[Assistant attorney general]: ... [T]he jurors made the decision to recommend a sentence of death for Mr. Perkins after the testimony of his aunt?
“[J.T.]: Yes.
“[Assistant attorney general]: And so that would have taken place during the penalty phase?
“[J.T.]: Um — ”
(R. 395-96.)
This Court agrees with the circuit court that J.T.’s testimony did not establish by a preponderance of the evidence- that the jurors engaged in any premature deliberations. Therefore, the circuit court did not abuse its discretion by denying relief on this claim.
More importantly, J.T. should not have been permitted to testify regarding the jury’s deliberations. Rule 606(b), Ala. R. Evid., states:
“Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror’s mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror’s mental processes in connection therewith, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror’s affidavit or evidence of any statement by the juror concerning a matter about which the *494 juror would be precluded from testifying be received for these purposes.”
Rule 606(b), Ala. R. Evid., specifically excludes the admission of juror testimony to attack “internal influences.” “[P]otentially premature deliberations that occurred during the course of the trial” ... have been held to “constitute[ ] a potential internal influence on the jury.” United States v. Logan, 250 F.3d 350, 380-81 (6th Cir.2001). See also Ledure v. BNSF Ry., 351 S.W.3d 13, 24 (Mo.Ct.App. 2011) (“Jurors’ testimony post-verdict is not admissible to show alleged premature deliberations by a juror.”); United States v. Sabhnani, 529 F.Supp.2d 384, 395 (E.D.N.Y.2008) (“[T]he Court finds that Rule 606(b)[, Fed.R.Evid.,] protects the finality of the verdict and bars any inquiry into the jurors’ deliberative processes.”).
“ ‘[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decision making has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.’ United States v. Reslco, 3 F.3d 684, 690 (3d Cir.1993). Indeed, ‘[preserving the finality of jury verdicts militates strongly in favor of barring post-trial juror assertions of pre-deliber-ation discussion. The probability of some adverse effect on the verdict is far less than for extraneous influences.’ United States v. Williams-Davis, 90 F.3d 490, 505 (D.C.Cir.1996).”
Taylor v. State, 270 P.3d 471, 481 (Utah 2012).
Because J.T.’s testimony was inadmissible and should not have been considered, the circuit court did not abuse its discretion in denying relief on Perkins’s claim that the jury engaged in premature deliberations.
IX.
Perkins next argues that the circuit court erred in denying his claim that jurors improperly permitted religion to influence their verdict. Specifically, Perkins argues that the jurors consulted Biblical passages during the jury’s deliberations in the penalty phase.
The circuit court stated the following concerning this claim:
“[T]here is insufficient evidence that the jurors improperly permitted religious activity to influence their verdict. Juror [J.T.] testified about events he recalled from approximately fourteen years pri- or. He claimed to remember that some jurors engaged in some type of religious activity on Sunday during deliberations, prayed during deliberations, and brought Bibles to the jury deliberation room. He did not specifically recall much of the activity, but claimed to remember something being said about ‘eye for an eye.’ He confirmed that he based his decision in this case solely on the law and evidence.
“After considering the testimony, I do not find credible evidence that the jurors engaged in improper activities that improperly influenced their verdict. In McNair v. State, 706 So.2d 828, 837-838 (Ala.Crim.App.1997), the Court of Criminal Appeals held:
“ ‘ “It is a well settled principle of law, and, further, it is fundamental to a fair trial, that jurors should consider only the evidence presented at trial.” Ex parte Troha, 462 So.2d [953,] 954 [ (Ala.1984) ]. “Extraneous materials, whether they be dictionaries, law books, or Bibles, unless properly received in evidence, are not allowed in the jury room for use by a deliberating jury.” Jones v. Kemp, 706 F.Supp. 1534, 1560 (N.D.Ga.1989). *495 However, a new trial is not automatically required when a jury is exposed to extraneous material or evidence. The standard for deciding whether juror misconduct (in this case the introduction of extraneous material in the jury room during deliberation) requires a new trial in a criminal case is set forth in Roan v. State, 225 Ala. [428,] 435, 143 So. [454,] 460 [ (1932) ]: “The test of vitiating influence is not that it did influence a member of the jury to act without evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.” See Ex parte Lasley, 505 So.2d 1263 (Ala.1987); Ex parte Troha; 23A C.J.S. Criminal Law § 1437 (1989). The Roan test mandates reversal when juror misconduct might have influenced the verdict.
“ ‘Each case must turn on its own set of facts. Nichols v. Seaboard Coastline Ry., 341 So.2d 671 (Ala. 1976); Allred v. State, 55 Ala.App. 74, 313 So.2d 195, cert, denied, 294 Ala. 751, 313 So.2d 203, cert, denied, 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86 (1975).
“ ‘ “Weighing heavily against the absolutism of a rule impeaching all extraneous matter verdicts is the well established rule that jury verdicts are presumed to be correct, and that this presumption is strengthened when the trial court, as here, refused to grant a new trial. Allred v. Dobbs, 280 Ala. 159, 190 So.2d 712 (1966). It is the head on collision course of these two dominant rules — the presumption of correctness of jury verdicts versus the right to a fair and impartial trial, governed exclusively by the evidence given from the witness stand and the law given by the court — that requires us to resolve this issue on a case by case basis.
“ ‘ “Only by individual consideration of all attending circumstances of each case can it be determined which one of these fundamental rules must give way in accommodation to the other. We are unwilling to say every extraneous matter verdict must be set aside absent a factual showing to the reasonable satisfaction of the trial judge that the verdict is the prejudicial result of such extraneous matters. See, for example, Clay v. City Council of Montgomery, 102 Ala. 297, 14 So. 646 (1893).”
“‘Nichols v. Seaboard Coastline Ry., 341 So.2d at 674 (emphasis original).
“ ‘ “Generally, accused, seeking a new trial on the ground of misconduct of the jury, sustains the burden of proof resting on him when he shows that the misconduct actually occurred, and that it was of such a character as might have been prejudicial to him_” 23A C.J.S. supra, at § 1437. The petitioner in a Rule 32 proceeding has the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle him to relief. Rule 32.3[, Ala. R.Crim. PJ
“[J.T.’s] memory of the events was questionable at best. In any event, there is no evidence that any extraneous event, if it occurred, improperly influenced the jury verdict.”
(R. 4491-92.)
J.T. testified at the postconviction hearing that the jurors, who were sequestered during trial, read passages from the Bible on Sunday during the trial because they were not allowed to go to church. He *496 further testified that some jurors brought Bibles into the jury room, although he was not one of them. J.T. said that during deliberations a juror, whom he could not identify, read passages from the Bible to “comfort” the jurors in making a decision. (R. 390.) When asked, J.T. could not identify the specific Bible passages but did say that he remembered the phrase “an eye for an eye.” J.T. testified twice that the Bible reading had no impact on his decision and that his decision was based on the facts and the law. Some of J.T.’s testimony was inconsistent. He was subjected to redirect-examination and recross-examination numerous times. It is clear that J.T. was having great difficulty in recalling what happened at Perkins’s trial 14 years ago.
This Court has held that the use of a Bible during deliberations constitutes an external influence on the jury. See McNair v. State, 706 So.2d 828 (Ala.Crim. App.1997). But see Robinson v. Polk, 438 F.3d 350, 363-64 (4th Cir.2006) (“[T]he reading of Bible passages invites the listener to examine his or her own conscience from within. In this way, the Bible is not an ‘external’ influence. In addition, reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence.”).
When reviewing a claim of juror misconduct based on the consideration of extraneous materials, our Supreme Court has stated:
“Generally, under Alabama law, juror misconduct involving the introduction of extraneous materials warrants a new trial when one of two requirements is met: 1) the jury verdict is shown to have been actually prejudiced by the extraneous material; or 2) the extraneous material is of such a nature as to constitute prejudice as a matter of law. Knight v. State, 710 So.2d 511, 517 (Ala.Crim.App. 1997). We conclude that neither of those requirements has been met in this case.
“Apicella argues that when a court is determining whether a juror’s conduct has caused actual prejudice the standard applied is whether the extraneous material ‘might have influenced that juror and others with whom he deliberated,’ Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932). Apicella relies heavily upon this statement in Roan:
“ ‘The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.’
“225 Ala. at 435,143 So. at 460.
“On its face, this standard would require nothing more than that the defendant establish that juror misconduct occurred. As Apicella argues, the word ‘might’ encompasses the entire realm of possibility and the court cannot rule out all possible scenarios in which the jury’s verdict might have been affected.
“However, as other Alabama cases establish, more is required of the defendant. In Reed v. State, 547 So.2d 596, 598 (Ala.1989), this Court addressed a similar case of juror misconduct:
“ ‘We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror’s [misconduct]. Rather, it is a case’s own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been *497 reached. While the question of whether she might have been unlawfully influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant’s motion for a new trial that her vote had not been affected by the [misconduct].’
“It is clear, then, that the question whether the jury’s decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case. In this case, as in Reed, the effect of the misconduct was confined to the juror who committed the misconduct. The Reed Court stated:
“ ‘We cannot agree with the defendant that the verdict rendered might have been unlawfully influenced, where the results of the [misconduct] were known only to the one juror who [committed the misconduct] and that juror remained unaffected by the [misconduct].’
“547 So.2d at 598. Because no evidence indicates that S.B. shared the content of his conversation with the other members of the jury and because no evidence indicates that S.B.’s own vote was affected, we cannot say the trial court abused its discretion in finding no actual prejudice.
“Apicella also argues that we should hold the extraneous material introduced through S.B.’s conversation with T.R. to be prejudicial as a matter of law. Api-cella supports this argument with the following language from Knight, 710 So.2d at 517:
“ ‘ “Juror misconduct will justify a new trial ... when from the extraneous facts prejudice may be presumed as a matter of law.” Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984).... However, in some cases, “the character and nature of the extraneous material [constitute] prejudice as a matter of law and no showing that the jury was in fact influenced thereby in arriving at their verdict is necessary.” Id. (prejudice presumed as a matter of law from jury’s consulting encyclopedia and dictionary definitions ...).’
“(Quoting Minshew v. State, 594 So.2d 703, 716 (Ala.Crim.App.1991)).
“On the other hand, we have also held that ‘mere exposure to [a] definition does not require a new trial as a matter of law.’ Pearson v. Fomby, 688 So.2d 239, 245 (Ala.1997). Our holding in Pearson serves to emphasize the limitations of the doctrine of ‘prejudice as a matter of law.’
“Generally, a presumption of prejudice applies only in a case in which the jury’s consideration of the extraneous material was ‘ “crucial in resolving a key material issue in the case.” ’ Dawson v. State, 710 So.2d 472, 475 (Ala.1997) (citing Hallmark v. Allison, 451 So.2d 270, 271 (Ala.1984), and Ex parte Thomas, 666 So.2d 855 (Ala.1995)).
“We are not willing to presume prejudice as a matter of law in this case. No evidence indicates that extraneous information arising from S.B.’s conversation influenced S.B.’s vote or that the information was ever considered by any other member of the jury. This case is distinguishable from cases such as Nichols v. Seaboard Coastline Railway, 341 So.2d 671 (Ala.1976) (prejudice found as a matter of law where juror brought definitions into the jury room during deliberations and copied them onto a chalkboard). We conclude that the particular circumstances of this case provide no basis for finding prejudice as a matter of law.”
*498 Ex parte Apicella, 809 So.2d 865, 870-72 (Ala.2001).
In the federal courts, collateral relief based on a jury’s consultation of Biblical passages during deliberations is routinely denied where there is no showing of prejudice.
“In collecting relevant cases, the Fifth Circuit stated, ‘Most circuits have ruled that when a Bible itself enters a jury room, the jury has been exposed to an external influence.’ Oliver v. Quarter-matt, 541 F.3d 329, 339 (5th Cir.2008). However, most habeas courts have denied relief even when the Bible was used during deliberations if there was a finding of no prejudice. See id. at 336-39 (finding on collateral review that, where several jurors read aloud Bible passages factually relevant to the case, the jury’s consideration of the Bible ‘crossed an important line’ and deprived defendant of his Sixth Amendment rights, but concluding that defendant did not rebut the presumption of correctness of the state court’s finding that the Bible did not prejudice the jury decision); Fields v. Brown, 503 F.3d 755, 777, 780-81 (9th Cir.2007) (en banc) (denying habeas relief where the foreperson consulted the Bible in generating a list with points both ‘for’ and ‘against’ the use of the death penalty, which he then used in deliberations); McNair v. Campbell, 416 F.3d 1291, 1307-09 (11th Cir.2005) (finding on habeas review that the foreperson’s reading aloud from Bible and leading jurors in prayer during deliberations amounted to consideration of extrinsic evidence in violation of the Sixth Amendment, but concluding that defendant failed to rebut the state court’s finding that the verdict was not prejudiced). But cf. Jones v. Kemp, 706 F.Supp. 1534, 1560 (N.D.Ga.1989) (granting a writ of habeas corpus based on implied judicial sanction where juror had requested court’s permission to bring a Bible into the jury room, but distinguishing the situation of jurors merely possessing Bibles, even in the jury room, for personal inspiration or independent spiritual guidance).”
United States v. Rodriguez, 667 F.Supp.2d 218, 222 (D.Mass.2009). See Hernandez v. Martel, 824 F.Supp.2d 1025,1145 (C.D.Cal. 2011) (“[Petitioner falls far short of showing by a preponderance of the evidence that the jury considered the Bible in its deliberations.”). See also Jeremy Sporn, Legal Injection? The Constitutionality of the Bible in Capital Sentencing Deliberations, 83 Tul. L.Rev. 813 (2009); Dean Sanderford, The Sixth Amendment, Rule 606(B), and the Intrusion into Jury Deliberations of Religious Principles of Decision, 74 Tenn. L.Rev. 167 (2007); Gregory Ashley, Theology in the Jury Room: Religious Discussion as ‘Extraneous Material’ in the Course of Capital Punishment Deliberations, 55 Vand. L.Rev. 127 (2002).
As one court has noted:
“We do not find it surprising that ‘conscientious people who are faced with a life and death decision resort to their religious scruples in reaching such a decision. Such deep introspection neither violates principles of justice nor prejudices the defendant.’ Bieghler v. State, 690 N.E.2d 188, 203 (Ind.1997), cert, denied, 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998).”
Young v. State, 12 P.3d 20, 48-49 (Okla. Crim.App.2000) (footnote omitted). “Prayer is almost certainly a part of the personal decision-making process of many people, a process that is employed when serving on a jury.” State v. DeMille, 756 P.2d 81, 84 (Utah 1988).
J.T. testified that the Bible had no impact on his verdict in the penalty phase. No other jurors testified. Without more, *499 this Court cannot say that the circuit court abused its discretion in finding that Perkins failed to establish prejudice. Accordingly, this claim does not entitle Perkins to any relief.
X.
Last, Perkins argues that the circuit court “might have” erred in finding that the documents he requested from the Alabama Department of Human Resources were not subject to discovery.
In Ex parte Perkins, this Court held that although Perkins was entitled to discover his own DHR records, he was not automatically entitled to discover the DHR records related to his mother, his stepfather, or his sister. This Court stated: “Because these records are confidential, the most a party is entitled to, upon a showing of good cause, is an in camera inspection of the documents by a circuit court.” 920 So.2d at 605.
After our decision, the circuit court reviewed the documents related to Perkins’s mother, stepfather, and sister and found that they were not subject to discovery. On appeal, this Court requested that the sealed documents be forwarded here, and this Court has examined these documents. After reviewing the documents, this Court agrees with the circuit court that they are not subject to discovery.
To be entitled to discovery in a postconviction proceeding, the petitioner must establish “good cause.” Ex parte Land, 775 So.2d 847, 852 (Ala.2000), overruled on other grounds by State v. Martin, 69 So.3d 94 (Ala.2011). This Court has held that a petitioner fails to establish good cause when the requested information is available through less intrusive means. See Jackson v. State, 183 So.3d 420, 471 (Ala.Crim.App.2009) (opinion on return to remand). Here, the requested information was available through Perkins’s family members; therefore, Perkins failed to establish good cause.
“ ‘On the first counseled [postconviction] petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.’ Pa R.Crim. P. 902(E)(2). ‘A showing of good cause requires more than just a generic demand for potentially exculpatory evidence.’ [Commonwealth u] Collins, [598 Pa. 397, 957 A.2d 237,] 272 [ (2008) ] (quoting Commonwealth v. Bryant, 579 Pa. 119, 855 A.2d 726, 750 (2004)). A general assertion of necessity will not suffice to establish good cause.”
Commonwealth v. Keaton, 45 A.3d 1050, 1094 (Pa.2012).
The circuit court did not err in denying Perkins’s motion to discover confidential DHR files related to Perkins’s mother, stepfather, and sister.
For the foregoing reasons, this Court affirms the circuit court’s denial of Perkins’s petition for postconviction relief attacking his capital-murder conviction and sentence of death.
AFFIRMED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.

. The circuit court noted in its order that it had written the order with no assistance.

. This Court has taken judicial notice of our records related to Perkins’s direct appeal. See Hull v. State, 607 So.2d 369, 371 (Ala. Crim.App.1992).

. This Court noted on direct appeal that the publicity surrounding the case was extensive. Perkins v. State, 808 So.2d 1041, 1068 (Ala. Crim.App.1999).

. R.B. and the other challenged jurors sat on Perkins’s jury. A postconviction petitioner may make a challenge-for-cause argument related only to the jurors who actually sat on the defendant’s jury. See. Heath v. Jones, 941 F.2d 1126, 1132-33 (11th Cir.1991) (citing Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)).

. This Court has repeatedly stated: "This court must avoid using 'hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance.” Hállford v. State, 629 So.2d 6, 9 (Ala.Crim.App.1992) (citing Falk-ner v. State, 586 So.2d 39 (Ala.Crim.App. 1991)).

. The record shows that counsel moved several times to be given advance notice of the aggravating circumstances but no advance notice was given. It appears that counsel was given notice immediately before the sentencing hearing.